**Application of Leslie Frederick WIGGINS et al.**

**Patent Appeal No. 8806.**

United States Court of Customs and Patent Appeals.

Oct. 11, 1973.

Janes & Chapman, New York City, for appellants. Leland L. Chapman, John R. Janes, New York City, of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

ALMOND, Senior Judge.

This is an appeal from the decision of the Patent Office Board of Appeals sustaining the examiner's rejection of claims 1, 2 and 10 of appellants' application [1] directed to compounds use-

1. Serial No. 526,707 filed February 11, 1966.

ful for treating Parkinson's disease. All these claims were rejected under 35 U.S.C. § 102(b) and claims 1 and 10 were rejected under 35 U.S.C. § 112. We reverse in part and affirm in part.

### Invention

Appellants' invention is most broadly set forth in claim 1 reproduced below:

1. A compound having anti-Parkinsonism activity selected from the class consisting of compounds of the formula:

and pharmaceutically acceptable salts thereof, in which formula X is selected from the group consisting of oxygen and sulphur, $R_1$ is selected from the group consisting of:

(A) $N - A -$, wherein $R_3$ represents lower alkyl, $R_4$ represents lower alkyl and A represents a group selected from the class consisting of unsubstituted and methyl-substituted straight-chain alkylene of two to three chain carbon atoms;

(B) $B \quad N - A$, wherein $B \quad N -$ represents a saturated heterocyclic group of five to seven ring atoms, from one to two nitrogen atoms, and up to one oxygen atom, and A represents a group selected from the class consisting of unsubstituted and methyl-substituted straight-chain alkylene of two to three chain carbon atoms; and

(C) $R_5-(CH_2)_n-$, wherein n is a positive whole number up to 2 and $R_5$ is a saturated heterocyclic group of five to seven ring atoms, up to one oxygen atom and from one to two nitrogen atoms, said heterocyclic group containing a member selected from the group consisting of unsubstituted and lower-alkyl-substituted basic ring nitrogen atoms spaced away from the adjacent carbonyl groups in the barbituric acid ring by from three to five carbon atoms;

and $R_2$ is selected, when X is oxygen, from the group consisting of:

(D) phenyl, halogenophenyl, hydroxyphenyl, lower alkylphenyl and lower alkoxyphenyl;

and when X is sulphur, from the group consisting of:

(E) phenyl, halogenophenyl, hydroxyphenyl, lower alkylphenyl, lower alkoxyphenyl, cyclohexyl, benzyl and straight-chain and branched chain alkyls having from three to seven carbon atoms.

Dependent claim 2 is somewhat narrower in scope than claim 1 in its definition of $R_1$ and $R_2$. Claim 10 is directed to the "acid addition salt form" of the compound of claim 1.

When X is oxygen, the compounds embraced by claim 1 are referred to as "oxobarbituric acids." Similarly, when X is sulfur, the compounds are referred to as "thiobarbituric acids." According to appellants' specification, these compounds are useful for the treatment of Parkinson's disease (paralysis agitans), a disease of the nervous system sometimes referred to as "shaking palsy."

The compounds encompassed by the claims can, for the most part, be prepared by a process well known to the prior art involving the condensation of urea or thiourea with a disubstituted malonic ester in the presence of a refluxing solution of sodium in an alcohol

**540**

(a sodium alcoholate). The disubstituted malonic ester has the formula:

wherein R is a lower alkyl group, preferably ethyl. Appellants term this process a "high temperature condensation."

Appellants found that certain oxo- and thiobarbituric acids could not be prepared this way because the malonic ester required for the synthesis was unstable and decomposed in the refluxing solvent. The malonic esters susceptible to this decomposition are described by appellants as those having the formula:

wherein $R_1$ represents:

(A) 
$$R_3$$
$$N - A -,\text{ wherein } R_3 \text{ represents a lower alkyl}$$
$$R_4$$

group and A represents an unsubstituted or methyl-substituted straight-chain alkylene radical having 2 or 3 chain carbon atoms; or

(B) B⎯N - A -, wherein B⎯N - represents a heterocyclic group containing from five to seven ring atoms and A represents an un-

substituted or methyl-substituted straight-chain alkylene radical having 2 or 3 chain carbon atoms; or

(C) $R_5 - (CH_2)_n -$, wherein n is 1 or 2 and $R_5$ represents 2-pyridyl or N-methyl-2-piperidinyl; and

Z represents hydrogen or at least one halogen, lower alkyl or lower alkoxy substituent, provided that when R represents a dimethylaminoalkyl group which is not substituted by methyl in the alpha position of the alkyl group, Z cannot represent hydrogen, but must be at least one halogen, lower alkyl or lower alkoxy substituent.

Appellants discovered that decomposition of the malonic ester could be avoided by carrying out the condensation at or below 30° C. However, at this temperature only the thiobarbituric acids could be obtained since urea, unlike thiourea, would not undergo condensation. Therefore, in order to obtain oxobarbituric acids which could not be prepared by the prior art process, appellants added yet another refinement to their process. First, they prepared the thiobarbituric acid analogue of the desired oxobarbituric acid which was then oxidized by a known process to the corresponding oxobarbituric acid. Appellants refer to this process as a "low temperature condensation."

*Opinion*

*Rejection Under § 112*

In support of the rejection of claims 1 and 10 under § 112, the examiner, in his "Supplemental Examiner's Answer On Remand," made the following observations:

The definitions of "B⎯N –" and "$R_5$" are indefinite and too broad.

The definitions particularly point out the nature of only one, two, or three, of the five to seven ring atoms. The claims are indefinite as to what other ring atoms can be present. The claims are also indefinite as to what and how

many substituents the heterocyclic groups can have, if any. The claims are too broad in that there is no proper support for such rings as pyrazolidinyl, isoxazolidinyl, oxadiazolidinyl, etc.—i. e. rings wherein the hetero-atoms are not separated by carbon atoms.

*   *   *   *   *   *

Re the rejection as failing to properly define the invention, appellants argue first that "a saturated heterocyclic group of . . . from one to two nitrogen atoms, and up to one oxygen atom" means "a saturated heterocyclic group in which the hetero-atoms are all selected from the group consisting of from one to two nitrogen atoms and up to one oxygen atom". Concededly, this is a possible construction of the language, but the language is open to other interpretations. * * Support for appellants' construction may be found in the fact that the specification discloses only heterocyclic groups containing nitrogen or nitrogen and oxygen.

It would appear that the examiner was of the opinion that appellants were claiming an invention that was broader than any described in their specification (a 1st paragraph, § 112 rejection) and were not distinctly claiming that which they regarded as their invention (a 2nd paragraph, § 112 rejection). The board agreed with the examiner's rejection, commenting, in part, as follows:

> Appellants' arguments do not persuade us of error in the Examiner's rejection. The terminology employed is so loose as to be indefinite and to be entirely speculative as to the inclusion of groups forming final products having the therapeutic activity herein required. * * *

*   *   *   *   *   *

It must also be noted that the claim terminology is so broad that it does not even require that the heterocyclic group contain a carbon atom. Heterocyclic ring systems containing phosphorus, boron, silicon, and other elements in addition to nitrogen and oxy-gen without the inclusion of carbon atoms are well-known and could not be expected to produce compounds having the properties herein claimed.

■■ In our view, the rejection under § 112 was properly made, at least insofar as it was based on the 2nd paragraph of § 112. That paragraph requires the applicant to "particularly point out and distinctly claim the *subject matter sought to be patented.*" In re Borkowski, 422 F.2d 904, 909, 57 CCPA 946, 951 (1970). If the scope of the invention sought to be patented is unclear from the language of the claim, a second paragraph rejection will properly lie.

In the instant case, the Patent Office questions whether the term "heterocyclic group" as defined in the claims possesses the requisite definiteness. Both the examiner and the board felt the term was not precise enough to allow the scope of the claims involved to be accurately determined. Appellants seek to overcome their specific criticisms by arguing that:

> * * * the claims clearly define the *maximum* breadth, namely, heterocyclic rings containing carbon and nitrogen, or carbon, nitrogen, and oxygen, having from five to seven ring atoms, one or two nitrogen atoms, and up to one oxygen atom. This is a rather limited scope, as heterocyclic rings go. There are many more heterocyclic compounds excluded by the claims than are included by them, such as, for instance, heterocyclic rings containing the two or more oxygen atoms, three or more nitrogen atoms, or one or more sulfur atoms, as well as other types of hetero atoms.

■ However, we agree with the examiner that appellants' interpretation of the scope of the claim is but one possible construction and that other, broader constructions are possible that are not unreasonable in light of the words of the claims. Words in claims are to be given "their broadest reasonable interpretation consistent with the specification where

the patent has not yet issued and the applicant has an opportunity to change them." In re Finsterwalder, 436 F.2d 1028, 1032, 58 CCPA 871, 876 (1971).

Applying this standard to claims 1 and 10, it is our view that the board was correct when it concluded that the "heterocyclic group" in those claims could be interpreted to include other members than those noted by appellants. Furthermore, the examiner, in his answer, indicated that appellants had support in the specification for a claim of the same scope that appellants would now have us give claims 1 and 10. Therefore, we do not think it would have been difficult to employ language in the claims *precisely* limiting them to that scope.

In view of our affirmance of the rejection under § 112 on the ground that the claims do not satisfy the requirements of the 2nd paragraph, it is not necessary for us to consider whether a rejection made under the 1st paragraph would have been justified.

### Rejection Under Section 102(b)

The rejection of claims 1, 2 and 10 under section 102(b) was based upon an article[2] published by Giudicelli et al. (Giudicelli). This reference reports the syntheses of a number of oxobarbituric acid derivatives (X=oxygen) and studies of their effect as sedatives. *None* of the compounds actually prepared and studied fall within the scope of the claims involved here. However, Giudicelli mentions by name two compounds that do, phenyl-beta-piperidinoethyl barbituric acid and phenyl-beta-morpholinethyl barbituric acid, whose syntheses were unsuccessfully attempted. The examiner recognized that the failure of Giudicelli to make these compounds was a defect in the reference. Therefore, he cited a second reference, a patent to Donnison,[3] which discloses a process for making oxo- and thiobarbituric acids. This process is similar to appellants' low temperature process.

The examiner concluded that Donnison's process could be used to prepare the compounds named by Giudicelli. The significance of this conclusion can be seen from the legal analysis of that situation, stated by him as follows:

> Giudicelli et al. could not prepare these compounds by their ¡ chosen method. However, the test of an "enabling disclosure" is not whether the reference teaches how to make the compounds, but whether the reference taken with the remainder of "the prior art is such as to place the disclosed 'compound' in the possession of the public."

The examiner's authority for this test was the decision of this court in In re Brown, 329 F.2d 1006, 51 CCPA 1254 (1964). See also In re LeGrice, 301 F. 2d 929, 49 CCPA 1124 (1962); In re Sheppard, 339 F.2d 238, 52 CCPA 859 (1964); In re Hoeksema, 399 F.2d 269, 55 CCPA 1493 (1968); In re Collins, 462 F.2d 538, 59 CCPA 1170 (1972). In his view, Giudicelli is an "enabling disclosure" since Donnison's process could be used to make the named compounds, thereby putting them in the possession of the public. The board agreed.

The examiner's rationale necessarily presumes that Giudicelli both describes the invention and would enable one skilled in the art to make the invention, the former by merely naming the compounds and the latter by viewing Donnison as evidence that one skilled in the art could make the named compounds, thereby making them available to the public.

Appellants argue that the rejection is improper since Giudicelli by itself does not disclose all that is necessary to put the compounds in the hands of the public. Because the Patent Office had to rely upon Donnison to overcome this defect in Giudicelli, appellants insist that the rejection must be considered as having been made over a combination of references. In their view, a rejection

2. Annales Pharm. Francaises, Vol. 15, 1957, pp. 533–546.

3. U. S. 2,876,225 issued March 3, 1959.

based upon a combination of references is proper only if the statutory basis is 35 U.S.C. § 103. Alternatively, appellants argue that the process taught by Donnison could not be used to make the named compounds.

The solicitor states the issue as to whether § 102(b) can be the proper statutory basis as follows:

> Does the rejection of compound claims for anticipation under 35 U.S.C. 102(b) preclude reliance on additional evidence to show that one of ordinary skill in the art would have known how to prepare the claimed compounds at the time appellants' alleged invention was made?

■■ The answer to the solicitor's question, and certainly the one desired by him, must be "No." Every patent application and reference relies to some extent upon knowledge of persons skilled in the art to complement that disclosed in order that it be "enabling" within the meaning of § 112 and to satisfy the requirements of a reference under § 102. For example, a reference describing an oil refinery need not describe how to make bolts and rivets in order to be considered "enabling." The hypothetical just stated is an extreme case. In closer cases, where it might be reasonably doubted that a reference or patent application satisfies § 102 or § 112, other references can be cited as evidence of the level of skill in the art.

■ However, we do not think that the outcome of this case revolves about the answer to the above-stated question. The defect in the issue, as stated by the solicitor, is that it presumes that the naming of the compounds by Giudicelli constitutes a description of the invention within the meaning of § 102(b). We do not accept this presumption. In our view, Giudicelli's listing of the compounds by name constituted nothing more than speculation about their poten-

tial or theoretical existence. The mere naming of a compound in a reference, without more, cannot constitute a description of the compound, particularly when, as in this case, the evidence of record suggests that a method suitable for its preparation was not developed [4] until a date later than that of the reference.

If we were to hold otherwise, lists of thousands of theoretically possible compounds could be generated and published which, assuming it would be within the level of skill in the art to make them, would bar a patent to the actual discoverer of a named compound no matter how beneficial to mankind it might be. In view of the fact that the purpose sought to be effectuated by the patent law is the encouragement of innovation, such a result would be repugnant to the statute. Therefore, we hold that the compounds named in Giudicelli and within the scope of the claims in issue were not "described in a printed publication" as meant by the applicable portion of § 102(b). This dictates a reversal of the rejection of claims 1, 2 and 10 under that section.

■ Our holding does not mean that a reference merely naming a compound is without effect at all. It may be used as evidence of obviousness under § 103 for all it fairly suggests to one of ordinary skill in the art. In fact, the solicitor suggests in his brief that it wouldn't matter in this case whether we view the statutory basis of the rejection as § 102(b) or § 103. We cannot agree.

■ In evaluating whether a rejection made under § 103 is proper, evidence not pertinent to a rejection made under § 102(b) may have relevance, i. e., commercial success, unexpected results, etc. For example, evidence of commercial success no matter how striking could not overcome a rejection of a claim based on its lack of novelty. It simply is not relevant or material to that point.

---

4. We do not mean to suggest that we have actually evaluated the process taught by Donnison and concluded that it could be used to prepare the claimed compounds. As this is irrelevant to our decision, we express no opinion on this point.

Therefore, since we do not know what additional evidence appellants might have been able to present if their claims had been rejected under § 103, it would not be proper for us to conjecture whether such a rejection might be sustained.

For the foregoing reasons, the rejection of claims 1 and 10 under 35 U.S.C. § 112 is affirmed, and the rejection of claims 1, 2 and 10 under 35 U.S.C. § 102(b) is reversed.

Modified.