Dr. Jerre M. FREEMAN, Plaintiff,

v.

MINNESOTA MINING AND MANUFAC-
TURING COMPANY, Defendant.

Dr. Jerre M. FREEMAN, Plaintiff,

v.

COOPERVISION, INC., Defendant.

Civ. A. Nos. 84–577 CMW, 85–46 CMW.

United States District Court,
D. Delaware.

Dec. 17, 1987.

Jeffrey B. Bove and Collins J. Seitz, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, Del. of counsel: Bradford E. Kile of Washington, D.C. and James E. Cockfield of Lahive & Cockfield, Boston, Mass., for plaintiff.

Charles S. Crompton, Jr. and David B. Brown of Potter, Anderson & Corroon, Wilmington, Del. of counsel: Walter N. Kirn, Patent Counsel for 3M in St. Paul, Minn., and John Gould of Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn., for defendant, in C.A. 84-577.

Donald F. Parsons, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. of counsel: Thomas R. Boland and Ellen A. Efros of Vorys, Sater, Seymour & Pease, Washington, D.C. for defendant, in C.A. 85-46.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This action arises out of separate patent infringement suits filed by Dr. Jerre Freeman against CooperVision, Inc. ("CooperVision") and Minnesota Mining and Manufacturing Company ("3M") for infringement of Freeman's patent relating to intraocular lenses. The suits were consolidated for the purposes of discovery and trial on the issues of validity, scope of the claims, infringement, and enforceability because of common issues of law and fact. Defendants 3M and CooperVision each filed a summary judgment motion. CooperVision subsequently filed a motion to strike an affidavit submitted by Freeman and to preclude proof on the subject matter of that affidavit. The Court denies both summary judgment motions, strikes the affidavit, but does not preclude proof.

## I. FACTS

An intraocular lens ("IOL") is an artificial lens placed within the eye to replace a damaged natural eye lens. It consists of an optical lens portion and supporting elements called haptics. The haptics serve to position the optical portion and maintain it in place. The IOL is placed in the anterior chamber of the eye. This chamber is filled with aqueous humor, a fluid with a density of approximately one.

On March 15, 1976, Freeman filed patent application number 666,651 for a "Neutral Buoyancy Intraocular Lens Device." The patent was issued on March 7, 1978, as U.S. Patent No. 4,077,071 ("'071 patent"). On May 31, 1979, Freeman filed a reissue application. The reissue patent was issued on August 7, 1984, as U.S. Reissue Patent No. 31,640 entitled "Buoyancy Intraocular Lens Device" ("'640 patent" or "Freeman's patent" or "reissue patent").

Freeman filed suit against 3M for infringement of the '640 reissue patent on October 5, 1984. He filed suit against Coo-

perVision on January 18, 1985. On May 20, 1985, the two cases were consolidated for trial on the issues of validity, scope of the claims, infringement, and enforceability. Damages, if any, will be the subject of separate trials. Discovery closed on October 31, 1986.

Subsequent to Freeman's filing these suits, 3M sought to have the Patent and Trademark Office ("PTO") reexamine the patents in light of publications that it believed anticipated the patents. On March 26, 1987, Freeman filed a Motion to Enjoin 3M from filing a petition for reexamination while the instant litigation was pending. This Court denied plaintiff's request for an injunction on April 30, 1987. *Freeman v. Minnesota Mining and Mfg. Co.*, 661 F.Supp. 886 (D.Del.1987). The PTO granted 3M's request for reexamination, and the proceedings are ongoing.

The defendants then filed four motions. Defendant CooperVision filed its Motion for Summary Judgment of Patent Invalidity because of prior publication on April 30, 1987 ("Motion 1").[1] It claimed that a Protocol of the Second Clinical Conference of the Moscow Experimental Laboratory for Experimental Surgery held on April 15, 1974 ("Russian Protocol" or "Protocol"), was published and shelved at the Moscow Research Institute of Eye Microsurgery ("Moscow Eye Institute") more than one year prior to Freeman's application for a patent. The Protocol discusses experiments performed with an IOL containing polypropylene haptics and refers to 150 having been made and 24 implanted. Patent Examiner Ronald L. Frinks was unaware of the existence of the Protocol at the time of the prosecution of the patent.

CooperVision also cites an article written by Dr. Joaquin Barraquer entitled "Nuevos Modelos de Lentes Plasticas de Camera Anterior" which appeared in *Anales de Instituto Barraquer*, Vol. II, No. 3 (1961) ("Barraquer Article"). Figure 15 of the Barraquer Article describes an IOL with a methacrylate optic and support members made of polyethylene, which has a density less than one. Figure 15 also states that "[t]here are still unresolved difficulties in the injection of the mould [sic] in perfecting this model." Patent Examiner Frinks was also unaware of this article.

In his opposition to CooperVision's summary judgment motion, Freeman submitted the affidavit of Dr. Donald MacKeen for the proposition that the Barraquer Article could not anticipate Freeman's patent because the device described in it was inoperable. CooperVision then filed a Motion to Strike the Affidavit of Dr. Donald MacKeen and to Preclude Proof on the issue of the inoperability of the device discussed in the Barraquer Article on June 5, 1987 ("Motion 4").

Defendant 3M also filed two motions. On May 1, 1987, 3M filed its Motion for Partial Summary Judgment Regarding Claim Scope ("Motion 2"). On May 26, 1987, 3M filed its Motion to Lift the Confidential Status of Discovery Materials ("Motion 3").

The Court held oral argument on all four motions on June 25, 1987. Ruling from the bench, the Court granted 3M's motion to lift the confidentiality status of certain documents. This Opinion represents the Court's decision on the other three motions.

## II. COOPERVISION'S MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY

CooperVision filed a Motion for Summary Judgment that Reissue Patent No. 31,-640 [2] is invalid as a matter of law because the invention was disclosed in publications more than one year prior to the date of the original patent application, March 15, 1976. It claims that the Russian Protocol and the Barraquer Article, as printed publications prior to March 15, 1975, invalidate the '640

---

1. The motions will be referred to in citations numerically in order of filing. For example, citations to CooperVision's Brief in Support of its Motion for Summary Judgment of Patent Invalidity will be cited as: CooperVision's Brief in Support of Motion 1 at ___.

2. CooperVision's motion concerns only the '640 patent, not the original '071 patent. CooperVision's Brief in Support of Motion 1 at 3 n. 2.

reissue patent.[3] The PTO was unaware of the references. Deposition of Examiner Roland L. Frinks at 22, 25, CooperVision's Brief in Support of Motion 1, app. 3. Because genuine issues of material fact exist as to the status of both the Russian Protocol and the Barraquer Article as invalidating references, the Court denies CooperVision's Motion.

### A. *The Legal Standard*

The Court's summary judgment analysis under Rule 56 of the Federal Rules of Civil Procedure is the same in patent cases as in other types of cases. *See, e.g., Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir.1987) (summary judgment is appropriate in patent cases if no genuine issue of material fact exists). To prevail, CooperVision must demonstrate the absence of any genuine issue of material fact and prove that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must resolve all ambiguities and doubts as to the existence of factual issues in favor of Freeman. *Howes*, 814 F.2d at 643. Therefore, to prevent summary judgment, Freeman need just "point to an evidentiary conflict created on the record." *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149 (Fed.Cir.1986) (citation omitted). The facts material to this motion are those concerning whether the Russian Protocol and the Barraquer Article are prior publications under the patent laws.

■■■ A patent is invalid as a matter of law if "the invention was patented or described in a printed publication in this or a foreign country ... more than one year prior to the date of application for the patent in the United States." 35 U.S.C.

§ 102(b) (1982). The "determination of whether certain materials are 'printed publications' under Section 102(b) is a mixed question of fact and law and, in general, is not subject to summary judgment." *Tyler Refrigeration Corp. v. Kysor Indus. Corp.*, 553 F.Supp. 279, 284 (D.Del.1982). But situations may exist where summary judgment may be appropriate. The key issues for the Court are whether the invention was *described*, whether there was a *publication*, and if so, what the publication's *date* was.

Section 102(b) refers to the date of application for the patent, here March 15, 1976. Therefore, one issue for the Court to determine is whether the documents were printed publications before March 15, 1975, one year prior to the date of application.

■■■ The document need not be formally "printed" to be a printed publication. *In re Wyer*, 655 F.2d 221, 225 (C.C.P.A.1981). Section 102(b) "was designed to prevent withdrawal by an inventor, as the subject of a patent, of that which was already in the possession of the public." *Id.* at 226. Thus, the determination of whether a document is a printed publication requires the Court to focus on the unitary concept of "public accessibility." *Id.* The inquiry for the Court is whether there has been public dissemination of the document and whether the information contained in it is accessible to persons skilled in or interested in the art.[4] *Id.; Philips Elec. & Pharmaceutical Indus. Corp. v. Thermal & Elec. Indus., Inc.*, 450 F.2d 1164, 1170–71 (3d Cir.1971) (requiring "a satisfactory showing that a person interested in and ordinarily skilled in the art can locate [the publication] and understand the essentials of the claimed

---

**3.** The briefs also mention a trade brochure from the company Kurt A. Morcher Medizinische Optiks, of Stuttgart, West Germany. CooperVision's Brief in Support of Motion 1 at 4 n. 4. Freeman asserts that Morcher's own statements make it clear that the brochure could not have an effective date that would invalidate the patent. Freeman's Brief in Opposition to Motion 1 at 24. The Court will not address this issue, however, because CooperVision has limited this motion to the Russian Protocol and the Barraquer Article. CooperVision's Brief in Support of Motion 1 at 4 n. 4.

**4.** Section 102(b) refers to "printed publication[s] in this or a foreign country." 35 U.S.C. § 102(b) (1982). It is well settled that documents in libraries in Europe, *In re Hall*, 781 F.2d 897 (Fed.Cir.1986), or Australia, *In re Wyer*, 655 F.2d 221 (C.C.P.A.1981), can be printed publications. Thus, the fact that this motion concerns a Russian document and a Spanish article is irrelevant as long as the references were accessible to the relevant public.

invention without further research or experimentation."); *Tyler Refrigeration*, 553 F.Supp. at 282 (whether people concerned with the art "have had an opportunity to inspect and digest the information").

█ A reference must describe an invention sufficiently "to have placed the public in possession of it." *In re Donohue*, 766 F.2d 531, 533 (Fed.Cir.1985) (footnote omitted). It is not enough that the disclosure be descriptive, however; it must also be enabling. *Id.* The standard for what makes a disclosure enabling is that "one of ordinary skill in the art could have combined the publication's description of the invention with his own knowledge to make the claimed invention." *Id.* (citation omitted); *see also Preemption Devices v. Minnesota Mining and Mfg. Co.*, 559 F.Supp. 1250, 1259 (E.D.Pa.1983), *aff'd*, 732 F.2d 903 (Fed.Cir.1984) ("the description must be *so detailed* as to allow someone skilled in the area to replicate the patented device") (emphasis in original). A disclosed invention need not "actually [have] been made in order to satisfy the enablement requirement." *Donohue*, 766 F.2d at 533. Thus, it is not relevant that an author did not attempt to make the disclosed invention. However, failed attempts by those skilled in the art are evidence that a disclosure is nonenabling. *Id; see also Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1558 (Fed.Cir.1985) ("The 'failed' experiment reported in the prosecution history of the Mason patent renders that patent irrelevant as a prior art reference."). Thus, in *In re Wiggins*, 488 F.2d 538 (C.C. P.A.1973) and *In re Sheppard*, 339 F.2d 238 (C.C.P.A.1964), the courts held references insufficient as prior art because the references stated that attempts to prepare the claimed chemical compounds were unsuccessful.

To decide this motion, the Court must now examine the facts alleged by the parties. The Court must determine whether there are genuine issues of fact concerning any of the elements necessary for a document to be a prior publication that would invalidate Freeman's patent.

## B. *The Russian Protocol*

█ CooperVision claims that the Russian Protocol was indexed, shelved, and accessible in the library of the Moscow Eye Institute more than one year prior to the effective date of Freeman's application. It relies primarily on the deposition testimony of Professor S. Fyodorov, head of the Moscow Eye Institute, and also on the text of the Protocol, photographs of the library, and the affidavit of a library employee. Freeman opposes the motion with affidavits about Soviet libraries in general and about Professor Fyodorov, and challenges the reliability of some of CooperVision's evidence concerning the Protocol's accessibility. The Court denies the motion with regard to the Russian Protocol because there are genuine issues of fact concerning the Protocol's accessibility on the critical date.

█ Freeman does not challenge the fact that the Protocol adequately describes the invention. The Protocol is an extract from the record of a clinical conference at which B.P. Golubkov was the speaker. Under the heading "Subject of Report", the Protocol states that "[it] might be worth while [sic] to make loops of polypropelene [sic] since its specific gravity is not significant, and a lens with such loops can be weightless in the anterior chamber aqueous humor." CooperVision's Brief in Support of Motion 1, app. 2. The Protocol also includes statements that 150 lenses had been made, that Dr. Zakharov implanted 24 of them, and that Professor Fyodorov also implanted the lenses with good results. The invention was identified clearly enough in the Protocol so that those skilled in the art could easily recognize the invention from the text. *See In re Hall*, 781 F.2d 897, 899 (Fed.Cir.1986). Furthermore, the text actually states that people skilled in the art had made the lenses, thus eliminating any claim that the disclosure was nonenabling. *See In re Donohue*, 766 F.2d at 531.

CooperVision's version of the facts concerning the accessibility of the Protocol on the critical date relies on the deposition of Svyatoslav Fyodorov on August 8, 1986. Fyodorov is director of the Moscow Eye

Institute. Fyodorov deposition, CooperVision's Brief in Support of Motion 1, app. 6 at 11. He had previously been the Chief of the Experimental Laboratory at the Moscow Eye Institute, and he organized the Institute's library in 1970. *Id.* at 12. Thus, he is familiar with the library's operation and procedures.

Fyodorov claims that Dr. T.L. Klimova, the Scientific Secretary of the Institute, prepared the Protocol. Fyodorov deposition at 28–29, CooperVision's Brief in Support of Motion 1, app. 6. Klimova then gave the Protocol to the Institute's library, where it was indexed and shelved, in accordance with normal procedures, within one or two days. *Id.* at 29–31. Fyodorov claims that the Institute was accessible in that it had an open-door policy to both Soviet and foreign physicians. *Id.* at 13–14. Furthermore, American doctors, including Freeman, have visited the Institute since 1969. Freeman deposition at 528, CooperVision's Brief in Support of Motion 1, app. 8.

CooperVision originally produced no index showing that the Protocol was indeed filed by March 14, 1975. Instead it submitted a supplemental declaration by Politova Elena Alekseevna, who stated that she worked in the Institute's library, that it was routine practice to receive and shelve extracts a few days after conferences, and that the Protocol was shelved in 1974. Declaration of Politova Elena Alekseevna, submitted September 18, 1987. Alekseevna's declaration is accompanied by photographs of the Protocol, the notebook in which it is now contained, the index, and the shelves.

Freeman hotly contests the date on which the Protocol was shelved, as well as its accessibility.[5] He claims that the Protocol itself is not dated and that no index entry has been introduced which effectively proves when the Protocol was shelved.[6] He offers circumstantial evidence that casts doubt on the existence of an index, and points to inconsistencies in CooperVision's evidence.

Freeman casts doubt on the accessibility of the Protocol by submitting the affidavit of Dr. Boris Alexander Rivkin, a Canadian researcher who lived in the Soviet Union until 1976. Dr. Rivkin stated that the stacks in Soviet libraries are usually restricted and that unpublished reports are usually "withheld from the general circulation." Rivkin Affidavit, Freeman's Brief in Opposition to Motion 1, app. B at 4. He also stated that there are often no indexes to conference reports and that the reports are usually kept in annual reports rather than just being shelved. Rivkin also stated that he could not "recall ever seeing proceedings of a conference which were not at least one year old." *Id.* at 7. If Rivkin's statement described the situation relating to the Protocol, this would date its filing after March 15, 1975.

Freeman also submitted the affidavit of Vladimir Shlapentokh, a Soviet sociologist who teaches at Michigan State University. Dr. Shlapentokh claimed that during the 1970s, "a foreigner would not have been able even to enter the building of an average Soviet research institute without special permission, much less visit its library." Shlapentokh Affidavit, Freeman's Brief in Opposition to Motion 1, app. C at 2.[7] Fur-

---

**5.** Freeman also challenges the admissibility of the Protocol, claiming it is hearsay. Fed.R. Evid. 802. He claims that it is hearsay because the author of the Protocol was not deposed. The Court agrees with CooperVision that the Protocol is admissible non-hearsay. Section 102(b) requires only that the invention be described in a printed publication, not that the description be true. Therefore, the Protocol is being introduced, not for the truth of the matter asserted, *i.e.,* that 150 lenses were made or 24 implanted, but only for the fact that it was indeed written and filed before March 15, 1975. Thus, it cannot be hearsay.

**6.** Freeman also introduced evidence that a researcher in the United States could not locate the Protocol by using normal research tools. Affidavit of Donald MacKeen, Freeman's Brief in Opposition to Motion 1, app. D. This is irrelevant, because it is established that a foreign publication can be a reference. 35 U.S.C. § 102(b); *see, e.g., In re Hall,* 781 F.2d at 897 (document in West German library).

**7.** Shlapentokh also attacked Fyodorov's credibility based on the fact that Fyodorov is a Soviet official. He stated, "Generally, any claims made by Soviet officials ought to be critically

thermore, he claims that the Protocol would not be a publication in the U.S.S.R. because it does not bear the mark of a censor. *Id.* at 3.

Freeman also refutes the evidence contained in Alekseevna's declaration, claiming that it cannot possibly prove that the Protocol was filed in 1975. The Notebook in which the Protocol is now found is dated 1974–1979. It is likely that documents are placed in such books after the final date on the spine and that the Protocol was not placed in the notebook until 1979. Thus, its presence in the 1974–1979 Notebook proves nothing about its accessibility in 1975.

Freeman points to other problems as well. Letter from Jeffrey B. Bove, September 29, 1987. Alekseevna claimed that "Exhibit D includes true copies of additional extracts of Clinical Conference No. 2 held April 15, 1974" and that the library routinely received them a few days after the conferences were held. Alekseevna Declaration at 2. Freeman claims that in these extracts, the date "31.07.86" is written in, the letterhead includes the new address of the Institute, only available after 1978, and there is a mark hidden under the "Exhibit D" sticker from the printing agency indicating that the paper was printed in 1985. Bove letter at 2. Thus, concludes Freeman, the document could not have existed in 1975.

The Court cannot grant summary judgment that the Russian Protocol is a printed publication that invalidates Freeman's patent. The Court's role in a summary judgment motion is to determine whether there are genuine issues of material fact, not to decide them. Freeman has demonstrated that genuine issues of material fact exist as to when, if at all, the Protocol was indexed and shelved by casting doubt on the only real evidence provided, the photo-

graphs. He also raised issues about the accessibility of the library and of the Protocol within the library. Furthermore, all doubts concerning whether there are genuine issues must be resolved in favor of Freeman. Therefore, CooperVision's Motion for Summary Judgment that the existence of the Russian Protocol invalidates the '640 reissue patent is denied.

### C. *The Barraquer Article*

■ CooperVision also claims that the Barraquer Article, published in 1961, is a reference that invalidates the '640 patent. The article states that "[t]he model represented in figure 15, would be among the best if the injection technique could be perfected." Barraquer Article, Coopervision's Brief in Support of Motion 1, app. 1 at 3. This lens has a support made through injection of polyethylene into a mold. However, the author states that "there are still unresolved difficulties in the injection of the mould [sic] in perfecting this model." *Id.* at 6. Because there is a genuine issue of material fact as to whether this last statement means that the publication is nonenabling, summary judgment must be denied.

CooperVision claims that the Barraquer Article teaches polyethylene as a suitable support material and that because polyethylene has a density less than one, it covers Freeman's patent. Furthermore, it claims that because making IOLs is not an "esoteric art", the article discloses Freeman's invention to those skilled in the art.

Freeman does not contest the accessibility or date of the Article and admits that it was published in 1961, more than one year prior to his application. Freeman attempts to create an issue as to whether the disclosure is enabling by challenging the disclosure on several grounds. First, he claims that it is only a hypothesis, that the article itself did not mention that Barraquer had

examined, insofar as Soviet officials frequently lie and dissemble (e.g., official Soviet explanations of the KAL shootdown and of the Chernobyl accident have been proven false). This practice continues to the present day." *Id.* at 4. He also pointed to a specific instance in which he knew that Fyodorov lied and to Fyodorov's "desire, natural in a Soviet official, to present the best possible image of the Soviet system." *Id.* at 5. The Court need not consider this evidence concerning Fyodorov's credibility because the Court finds that there are genuine issues of material fact as to accessibility and because, at this stage, the Court is determining whether genuine issues of material fact exist, not what the facts are. Fed.R.Civ.P. 56(c).

made any IOLs utilizing the invention, and that Barraquer has stated that his use of the prototype IOLs contained in the article never went "beyond the experimental stage." Barraquer letter, Freeman's Brief in Opposition to Motion 1, app. E. However, it is irrelevant that Barraquer did not make the disclosed invention. *In re Donohue,* 766 F.2d at 533. Likewise, the fact that Freeman never saw an IOL with polyethylene supports, Freeman Affidavit, Freeman's Brief in Opposition to Motion 1, app. G, does not mean that the Barraquer Article is not an invalidating reference because the law does not require that an invention disclosed in a publication be commercialized or perfected for the disclosure to be an invalidating reference. *Dunlop Co., Ltd. v. Kelsey–Hayes Co.,* 484 F.2d 407, 413 (6th Cir.1973).

Freeman also claims that the prototype in Figure 15 was inoperable. Freeman submitted the affidavit of Donald L. MacKeen to prove that polyethylene is inoperable as an IOL support. Freeman's Brief in Opposition to Motion 1, app. F. However, this affidavit has been stricken and the information contained in it cannot be considered on this motion. *See* discussion of Coopervision's Motion to Strike the MacKeen Affidavit, *infra* Section III. Freeman also submitted the deposition testimony of Richard L. Kronenthal that polyethylene is not suitable as a suture material. Freeman's Brief in Opposition to Motion 1, app. I. However, Kronenthal subsequently stated that this testimony had no bearing on the suitability of polyethylene for IOLs and that no such inferences should be drawn. CooperVision's Reply Brief to Motion 1, app. Thus, the only evidence proffered by Freeman that can still be considered is that 3M and CooperVision have not made IOLs with polyethylene supports. This circumstantial evidence alone is not enough to create a genuine issue of material fact.

Freeman also raises the issue that Barraquer himself was *not able* to make an IOL with polyethylene supports. He cites the fact that Barraquer never perfected the technique and never made a lens with polyethylene supports. This does present a genuine issue of material fact, because although not attempting to make a lens with polyethylene supports is not grounds for dismissing a reference, the *failure* by those skilled in the art to be able to make the invention means that the disclosure is nonenabling. *In re Donohue,* 766 F.2d at 533 ("failures by those skilled in the art . . . are strong evidence that the disclosure of the publication is nonenabling"). Thus, a genuine issue of material fact exists as to whether persons skilled in the art could make the lens and summary judgment must be denied. CooperVision argues that it may be the case that someone skilled in the art would not be prevented from making the IOL by the unresolved difficulties in the molding technique. However, no expert testimony was profferred on this subject and it is also a genuine issue of material fact to be decided at trial. Thus, CooperVision's Motion for Summary Judgment is denied.

## III. COOPERVISION'S MOTION TO STRIKE THE AFFIDAVIT OF DR. DONALD L. MACKEEN AND TO PRECLUDE PROOF

### A. *MacKeen Affidavit*

CooperVision partially based its motion for summary judgment on the grounds that Freeman's invention was anticipated by the Barraquer Article. Freeman opposed the motion by attempting to show that the invention described in Figure 15 of the Barraquer Article was not prior art because polyethylene is inoperable as a haptic material. Freeman submitted the affidavit of Dr. Donald L. MacKeen which, after stating his professional qualifications, stated that:

(2) *Upon information and belief,* the physical structure of polyethylene has alternating crystalline and non-crystalline regions which makes it wholly unsuitable for prolonged implantation in the aqueous humor of the eye as required in intraocular lens devices.

(3) Further, *upon information and belief,* the surface of polyethylene is subject to destructive attack by hydrogen

peroxide, a common component of the aqueous humor of the eye. Freeman's Brief in Opposition to Motion 1, app. 5 (emphasis added). This affidavit is insufficient and the Court will strike it.

Rule 56(e) of the Federal Rules of Civil Procedure permits parties to supplement memoranda in opposition to summary judgment motions with affidavits which demonstrate that there are genuine issues of material fact. Fed.R.Civ.P. 56(e). However, the rule also states that the affidavits

> shall be *made on personal knowledge,* shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... [the response] *must set forth specific facts* showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e) (emphasis added). The MacKeen affidavit clearly does not meet these requirements.

First, both statements 2 and 3 indicate that they were made "upon information and belief," rather than upon MacKeen's personal knowledge, thus violating the requirement of Rule 56(e). *See Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950) (affidavit "made upon information and belief ... does not comply with Rule 56(c)"); *Powerlock Floors, Inc. v. Robbins Flooring Co.,* 280 F.Supp. 627, 630 (D.Del.) (affidavits based upon information and belief are "of no avail to plaintiff"), *aff'd.,* 404 F.2d 875 (3d Cir.1968). The affidavit also does not "show affirmatively that the affiant is competent to testify to the matters therein." Fed.R.Civ.P. 56(e). Instead, MacKeen merely states his professional positions without demonstrating any expertise in dealing with polyethylene. Furthermore, the affidavit is in the nature of an opinion or a general denial rather than a document which "set[s] forth specific facts." *Id.* Finally, there is evidence that Bradford Kile, Freeman's attorney, may have admitted that the affidavit was insufficient during discussions with opposing counsel. Motion 4, Certification of Ellen A. Efros at 2.

Freeman argues that the affidavit is sufficient because Dr. MacKeen is an expert and the affidavit is based on his "professional knowledge, judgment and opinion" rather than upon information and belief. Freeman's Brief in Opposition to Motion 4 at 3. He claims that this is sufficient because Rule 702 of the Federal Rules of Evidence permits experts to testify and render opinions as to matters to which they do not have personal knowledge. This argument fails to support the use of such an affidavit to oppose a summary judgment motion.

Freeman's argument fails because Rule 56(e) does not differentiate between affidavits by experts and non-experts and provides no exception for affidavits based on "professional knowledge, judgment and opinion." Furthermore, courts have held affidavits by experts insufficient when not based on personal knowledge. *See, e.g., Kern v. Tri-State Ins. Co.,* 386 F.2d 754, 756 (8th Cir.1967) (affidavit by doctor who based expert opinion on outside evidence held insufficient). Rule 702 governs whether MacKeen could testify at trial, but Rule 56(e) governs the situation at hand. Although it is true that Rule 56(e) requires that the affidavit "set forth such facts as would be admissible into evidence," that is only one requirement of a Rule 56 affidavit. Summary judgment motions concern whether there are material facts in dispute. An unsubstantiated affidavit based on experiments or knowledge not referred to in the affidavit does not meet the requirements of Rule 56(e) and cannot be considered in opposition to a summary judgment motion.

Freeman also argues that MacKeen based his affidavit on discussions he had with, and information regarding polyethylene provided by, Dr. Christine Kreiner from Adatomed of Munich, West Germany. Freeman's Brief in Opposition to Motion 4 at 7. Dr. Kreiner is reputed to be knowledgeable about the properties and characteristics of polyethylene. *Id.* The Court may allow parties to supplement affidavits with other affidavits. Fed.R.Civ.P. 56(e). Freeman seeks to admit a later affidavit by

Dr. Kreiner because Dr. Kreiner was the source of MacKeen's information and the affidavit would not be based on information and belief. However, Dr. Kreiner's affidavit is also insufficient under Rule 56(e).

Dr. Kreiner's affidavit states that:

(1) I am General Manager of ADA-TOMED, a manufacturer of intraocular lenses....

(2) Polyethylene tends to build up crystalline regions which makes it unsuitable for implantation as a support loop material for intraocular lens devices to be placed within the aqueous humor of the human eye.

Freeman's Brief In Opposition to Motion 4, app. A. Like MacKeen's, Dr. Kreiner's curriculum vitae makes no reference to any expertise in the uses of polyethylene. *Id.* In addition, the affidavit is conclusory and does not set forth facts demonstrating a genuine issue for trial or showing the basis for any of the statements.

The Kreiner affidavit should also not be admitted because it is untimely. Freeman stated that the reason why the MacKeen affidavit was originally submitted was because Dr. Kreiner was in Germany and could not be reached in time. Freeman's Brief in Opposition to Motion 4 at 7. However, Freeman could have moved for a continuance or extension of time if Kreiner's affidavit was unavailable at the time when Freeman's brief was due. Fed.R.Civ.P. 56(f).

### B. *Preclusion of Proof*

CooperVision also seeks to preclude Freeman from introducing any proof on the issue raised by the MacKeen affidavit, the inoperability of polyethylene as a support material. It claims that Freeman failed to supplement prior discovery responses which requested revelation of the identity of all expert witnesses, such as Dr. MacKeen, and Freeman's information counter to the Barraquer Article. CooperVision claims that this violated Freeman's duty to supplement his discovery responses. Fed.R.Civ.P. 26(e). In the alternative, Cooper-

Vision seeks to reopen discovery on the issues raised in the affidavit.

 Rule 26(e) does not impose a general duty to supplement discovery responses. However, it does impose a duty when the response deals with the identity of expert witnesses or the subject matter of their testimony, or with the identity of persons with knowledge of discoverable subject matter. Fed.R.Civ.P. 26(e)(1). A duty to supplement responses also arises when a response is no longer true and failing to amend it amounts to concealment. Fed.R.Civ.P. 26(e)(2).

CooperVision requested information about Freeman's experts and challenges to the Barraquer Article through both interrogatories and requests for admissions. CooperVision's Brief in Support of Motion 4 at 7. CooperVision also claims that MacKeen's name was never disclosed even though Freeman had several chances to update his responses. *Id.* at 7–12.

Freeman claims, however, that he was not fully aware of the fact that polyethylene was inoperable until he was preparing to respond to CooperVision's summary judgment motion. Freeman's Brief in Opposition to Motion 4 at 4. He also claims that this was rebuttal testimony and that he did not know whether it would be used until he knew that CooperVision would in fact rely on the Barraquer Article in its Motion.

Rule 26(e) only imposes the duty to "seasonably" amend or supplement prior discovery responses. Here, Freeman used the evidence soon after receiving CooperVision's Motion. It was at that time that Freeman became certain that MacKeen would be called as a witness because it would be necessary in order to challenge the operability of polyethylene and the prior art status of the Barraquer Article. In applying Rule 26(e), the Court must focus on the prejudice and surprise to CooperVision as well as CooperVision's ability to cure the prejudice. *Johnson v. H.K. Webster, Inc.,* 775 F.2d 1, 7 n. 7 (1st Cir.1985) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904–5 (3d Cir.1977)); *see also Murphy v. Magnolia*

*Electric Power Ass'n.*, 639 F.2d 232, 235 (5th Cir.1981).

The Court holds that Freeman did not violate Rule 26(e). This case is at the summary judgment stage, not trial. Any prejudice caused by introduction of the evidence can be cured by engaging in further discovery on the issue of the inoperability of polyethylene as a haptic material. The Court's denial of CooperVision's summary judgment motion on patent invalidity means that the issue of operability is still alive, and CooperVision will have sufficient opportunity to respond to Freeman's allegations.[8]

## IV. 3M's MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING CLAIM SCOPE

The final motion for the Court to consider is 3M's Motion for Partial Summary Judgment on the scope of claims 10–13, 15–18, and 21–22 of the reissue patent. These are the reissue claims which state that the support means provide "at least a degree of buoyant uplift" to the IOL. 3M contends that "sinking lenses", such as the IOL it manufactures, are not covered by these claims because the PTO adopted a narrow definition of "buoyant uplift" that excludes such lenses. It points to the prosecution history of the '071 patent and the '640 reissue patent and argues that the examiner allowed the reissue claims only because he adopted such a narrow definition.

### A. *The Claims*

▮▮ Freeman's invention concerns the use of low-density material in the haptics in order to relieve downward pressure on the tissues of the eye caused by the IOL. 3M describes three possible effects caused by using haptics with a density lower than

aqueous humor. 3M's Brief in Support of Motion 2 at 5. If enough low-density material is used, it can reduce the overall mean density of the IOL to below that of the aqueous humor so that the IOL can float. The IOL would then be called a "floating lens". If less low-density material is used, enough only to reduce the overall mean density of the IOL to that of aqueous humor, it will counterbalance the downward pull and produce "neutral buoyancy". Finally, if the overall mean density of the IOL remains greater than that of the aqueous humor, the IOL is called a "sinking lens". 3M claims that the IOL it manufactures is a sinking lens and that Freeman's patent does not cover it.

The '071 patent was issued on March 7, 1978. Claim 1 refers to an IOL with "(b) buoyancy means external of and attached to said optical lens having a mean density less than the density of said aqueous humor ... for reducing the overall mean density of said lens device to substantially that of said aqueous humor." This claim, which remains the same in the reissue patent, requires that the overall mean density be *substantially* the same as aqueous humor, not necessarily exactly the same.

3M argues that Freeman's invention consists of using enough support material to produce buoyant uplift, interpreted by 3M as meaning neutral buoyancy. Freeman, on the other hand, argues that his inventive concept was the use of haptics with density less than one, the density of aqueous humor, so as to add *a degree* of buoyancy, not necessarily to create neutral buoyancy. Freeman stated that because claim 1 could possibly be interpreted as requiring neutral buoyancy, and because attaining neutral buoyancy was not his invention, he filed for reissue on May 31, 1979. He sought reis-

---

8. The Court notes that even if Freeman had violated Rule 26(e), the result would be the same—reopening discovery. The Court has discretion whether to impose sanctions and, if so, what type to impose. 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2050, p. 327 (1970). The Court should consider explanations for the failure to supplement, "the importance of the testimony, the need for time to prepare to meet the testimony, and the possibility of a

continuance." *Id.* The courses of action available to the Court include excluding the testimony, allowing the testimony, or granting a continuance to allow the opposition to prepare a response. *Id.* Because this issue arises on a summary judgment motion and CooperVision will have time before trial to address Freeman's allegations, the equities would point to reopening discovery as the appropriate sanction.

sue to broaden the claims because he believed that his inventive concept covered sinking lenses and that claims reflecting this concept would still be patentable over the prior art. Reissue Declaration, Freeman's Brief in Opposition to Motion 2, app. C, A.

The reissue claims at issue all include, either directly or by reference, the phrase "at least a degree of buoyant uplift". An example is reissue claim 10, which claims "said support means having a density less than the density of the aqueous humor of the eye for providing at least a degree of buoyant uplift to said optical lens." Freeman believes that this claim covers sinking lenses because a sinking lens can still possess a "degree" of buoyant uplift, albeit less than would a neutrally buoyant lens. 3M, on the other hand, argues that the claim excludes sinking lenses because possessing buoyant uplift, any degree of it, means that an IOL is either neutrally buoyant or floating. 3M's motion requests the Court to determine the scope of these claims. The Court denies the motion because there are disputes concerning the interpretation of the claims that require extrinsic evidence and make this issue inappropriate for summary adjudication.

### B. Procedural Considerations

Freeman asserts that 3M's motion is procedurally defective because 3M "seeks preliminary and piecemeal adjudication of a non-dispositive factual issue under the guise of summary judgment." Freeman's Brief in Opposition to Motion 2 at 1. This is a patent infringement suit. Infringement analysis is a two-step process involving first, the determination of claim scope, and second, the examination of the challenged product in light of the claims. *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1118 (Fed.Cir. 1985); *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985). 3M's motion, however, seeks only the determination of claim scope, an issue in the infringement analysis.

Rule 56 authorizes courts to grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the Court does not grant a Rule 56(c) motion, then the court "shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy...." Fed.R.Civ.P. 56(d). 3M's motion seeks partial summary judgment of claim scope, part of an infringement case, rather than summary judgment of noninfringement.

Freeman argues that by filing for a judicial determination of claim scope rather than for summary judgment of noninfringement, 3M asks this Court for an advisory opinion. Because claim scope is only part of the case and determination of it would not amount to a "judgment", he alleges that 3M is seeking relief under Rule 56(d), rather than Rule 56(c), and that such a motion does not exist. *See Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 29 (N.D.Ill.1985) ("Rule 56(d) provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a motion properly brought under Rule 56's other provisions"); *see also Mendenhall v. Barber–Greene Co.,* 531 F.Supp. 947, 948 (N.D. Ill.1981) (accused infringer could not file a motion to determine the effective filing date of patent in suit).

3M argues that the Court should grant its motion because the Court has the power to withdraw facts not in dispute under Fed. R.Civ.P. 56(d). *Testa v. Janssen,* 492 F.Supp. 198, 204 (W.D.Pa.1980). Furthermore, granting the motion would be economical in terms of simplifying the issue for trial. *See Figueroa–Olmo v. Westinghouse Elec. Corp.,* 616 F.Supp. 1439, 1440 (D.P.R.1985) (courts should avoid a "wooden application" of Rule 56(d) because it may defeat the Federal Rules' goal of a "just, speedy and inexpensive determination of every action"). Furthermore, 3M argues that such an order *could* be dispositive because there is no dispute concerning the configuration of 3M's IOLs and thus an

order declaring a narrow claim scope may mean that 3M could not possibly have infringed Freeman's patent.

The Court will examine the scope of the reissue claims and rule on 3M's motion for partial summary judgment. It would save judicial resources and be economical for the parties if the issue could be summarily disposed of. Furthermore, the parties have already briefed and argued the issue. Thus, the Court will exercise its power to rule on facts when they are not in dispute and will examine the evidence on claim scope.

### C. Claim Scope

#### 1. Legal Standard

■ Claim scope is a question of law. *George v. Honda Motor Co., Ltd.,* 802 F.2d 432, 434 (Fed.Cir.1986); *Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 654 (Fed.Cir.1984). Thus, the existence of a dispute as to the legal issue of claim scope does not preclude the Court from granting 3M's motion for partial summary judgment. *George,* 802 F.2d at 434. The situation is different, however, when disputes over claim scope go beyond legal issues. The Federal Circuit has stated

> When a claim is in dispute, however, it is *always* necessary to look at certain extrinsic evidence, namely, the specification, the prosecution history, and the other claims ... Although claim construction (what its scope is) is a legal conclusion, *underlying factual disputes may arise which preclude summary judgment....* If complex scientific principles are involved or expert testimony is needed to explain a disputed term, for example, then an underlying factual question may arise which makes summary judgment improper.

*Howes,* 814 F.2d at 643 (emphasis added), (citing *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656 (Fed.Cir.1986); *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 867 (Fed.Cir. 1985); *Palumbo v. Don–Joy Co.,* 762 F.2d at 974). Thus, the Court cannot summarily adjudicate claim scope if there are underlying factual disputes or if defining "buoyant uplift" is complex enough to require expert

testimony to determine the meaning of the prosecution history. *Tillotson Ltd. v. Walbro Corp.,* 831 F.2d 1033, 1039 (Fed. Cir.1987). 3M has the burden of demonstrating that there are no genuine issues of material fact pertaining to the claim scope and that it is entitled to judgment of claim scope as a matter of law. Fed.R.Civ.P. 56(c).

#### 2. Prosecution History

■ 3M argues that various parts of the prosecution history prove that the examiner only allowed the reissue claims because he adopted a narrow definition of the term "buoyant uplift" which excludes sinking lenses. It argues that the definition is limited by the prosecution history and that Freeman should be estopped from changing the definition adopted by the PTO because public policy requires that competing companies be allowed to rely on the prosecution history as defining the invention. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452–53 (Fed.Cir.1985); *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 1583 (Fed.Cir. 1984).

Freeman invited industry's participation in the prosecution of the reissue patent. McGhan Medical Corporation, a division of 3M, participated in the prosecution as a protester. It made numerous objections including new matter, reissue estoppel, and obviousness. The examiner disposed of these rejections in an opinion referred to as Paper 31. 3M's Brief in Support of Motion 2, app. P ("Paper 31"). 3M alleges that in disposing of these rejections, examiner Frinks adopted a narrow definition of "buoyant uplift". Only with such a narrow definition, 3M argues, would Freeman be able to avoid a charge of claim recapture.

3M alleges that the examiner narrowly defined "buoyant uplift" to exclude sinking lenses when he refused to make a new matter rejection. 3M quotes the examiner as saying

> [t]hat the *entire IOL* has "a mean density less than or equal to the density of the aqueous humor[.] ... [A]ny object that has a density *less than or equal* to the

density of a fluid will tend to float and be weightless in the fluid and inherently, would possess a "buoyant uplift" rather than seek a position at the lower most level in the fluid. 3M's Brief in Support of Motion 2 at 12, (quoting Paper 31 at 3) (referring to column 4, lines 24–29 in the specification of the '071 patent). When viewed in context, however, it can be seen that the examiner did not clearly define "buoyant uplift".

The examiner was explaining that, although the term "buoyant uplift" was not used verbatim in the '071 patent's specification, the concept was present in the text. After the passage quoted above, the examiner went on to say that he found

no structural difference between the limitation "at least a degree of buoyant uplift" as now recited and "buoyant uplift" as previously recited in the claims. Any object that possesses a "buoyant uplift" obviously qualifies as having "at least a degree of" the same. By definition "buoyancy" or "buoyant" mean something that floats or has the ability or tendency to float or rise in liquid or air and therefore, exhibits upward pressure or uplift in the fluid.

Paper 31 at 3 (emphasis in original). The Court is not convinced that this indicates that the examiner adopted a narrow definition that excludes sinking lenses. The examiner defined "buoyancy" as including the tendency to rise and exhibit uplift. This does not necessarily exclude a sinking lens which exhibits a tendency to sink less because of the low-density haptics; it proves only that floating lenses and neutrally buoyant lenses do exhibit buoyancy.

3M also alleges that the examiner narrowly defined "buoyant uplift" when he distinguished the claims from the prior art. It claims that the examiner distinguished the prior art by saying that

there is no proper teaching in these references that the proposed "polypropylene loops" would be formed and calculated to the extent that overall mean density of the lens device would provide "at least a degree of buoyant uplift" or be "substantially that of said aqueous humor" which

are limitations that are required in all reissue claims.

Paper 31 at 17. 3M claims that the examiner's concern with "calculations" means that the reissue requires at least neutral buoyancy. Again, the examiner did not define buoyant uplift or exclude sinking lenses.

3M also cites the prosecution history as proving that the examiner had to adopt a narrow definition in order to remove a claim recapture rejection. However, it is not clear that the examiner had to rely on a limited definition of buoyant uplift in order to allow the reissue claims and avoid a claim recapture rejection. Section 251 permits reissue claims to be broader than the original claims if they are filed within two years of the granting of the original patent, as was done here. 35 U.S.C. 251 (1982). Also, an applicant can avoid a claim recapture rejection if the reissue claims are broader than the original claims if they are more restrictive than the cancelled claims in at least one significant respect. *Ball Corp. v. United States*, 729 F.2d 1429, 1436 (Fed.Cir.1984). The examiner concluded that claims 10, 15, and 26 are broader than claim 1, yet narrower than cancelled claim 1, which did not require *any* buoyant uplift. Paper 31 at 11. Specifically, he stated

Upon comparing this noted limitation [that of "providing at least a degree of buoyant uplift"] with the corresponding limitation "for reducing the overall mean density of said lens device to substantially that of said aqueous humor" that appears in the patented claims 1 and 7 it is apparent that reissue claims 10, 15, and 26 are broader in legal scope than patent claims 1 and 7. It is now readily apparent that the patent claims 1 and 7 require a more restrictive condition, namely, a *neutral buoyancy*, whereas reissue claims 10, 15, and 26 require a broader condition of "at least a degree of buoyant uplift", and cancelled claim 1 is a even broader since it does not require *any* overall buoyancy condition to necessarily exist for the lens device. Accordingly, it is now felt that the reissue claims are *narrower in scope and more*

restrictive *in at least one* significant respect than the cancelled claims ... Paper 31 at 11 (emphasis in original). Thus, in that portion of Paper 31, the examiner felt that possessing a degree of buoyant uplift was not synonymous with exhibiting neutral buoyancy. Furthermore, he again did not explicitly adopt a narrow definition of the term. Thus, it is possible that a sinking lens may exhibit a *degree* of buoyant uplift if it sank less and put less pressure on the tissues of the eye than it would if higher density haptics were used.

None of these arguments by 3M provide the Court with proof that the examiner excluded sinking lenses from coverage. Nowhere in Paper 31 does the examiner clearly state his definition of "buoyant uplift". This casts doubt on 3M's interpretation of the term. The Court needs expert testimony to be able to resolve this issue. Thus, the Court cannot grant 3M's motion for partial summary judgment.[9]

3M's case for summary adjudication is weakened even more if Freeman's reissue declaration is considered. Freeman sought reissue in order to broaden the claims and assure coverage of sinking lenses. Freeman's Brief in Opposition to Motion 2 at 9–12. This is supported by the fact that the word "Neutral" was dropped from the '071 patent's title of "Neutral Buoyancy Intraocular Lens Device," demonstrating that the reissue patent covers more than just neutrally buoyant IOLs. Freeman further alleges that the reissue claims were allowed in the same form that he submitted them, without a narrower definition by the examiner. *Id.* at 17. In support of his arguments, Freeman introduced the affidavit of Martin Adelman, a patent expert, who concluded that the reissue claims read directly on sinking lens. *Id.* at app. E. Although this affidavit is superfi-

cial in its analysis, it casts further doubt on 3M's interpretation of the reissue claims.

Finally, the Court notes that reissue claims may be granted in order to change the scope of a patent's coverage if the "patent is, through error without any deceptive intention, deemed wholly or partly inoperative ... by reason of the patentee claiming more or less than he had a right to claim in the patent." 35 U.S.C. 251 (1982). Freeman argues that the phrase "at least a degree of" was added during the prosecution to assure coverage of any amount of buoyancy. Freeman's Brief in Opposition to Motion 2 at 15. This phrase must have some meaning in clarifying the scope of the claims. The Court can understand how the term "buoyant uplift" standing by itself could possibly require that the IOL be neutrally buoyant or floating. When qualified by the words "at least a degree of", however, the phrase implies the existence of *degrees* of buoyant uplift. The Court needs expert testimony by those skilled in the art as to whether this would cover a sinking lens that sank less because of the use of low density haptics.

This dispute over claim scope cannot be resolved by examination of the prosecution history alone. The examiner did not state a clear definition of buoyant uplift and no clear definition can be inferred from the examiner's statements over the course of several years. In order to determine "the thrust and meaning of the prosecution history and prior art," *Tillotson*, 831 F.2d at 1039, the Court needs expert testimony by those skilled in the art on the phrases "neutral buoyancy" and "at least a degree of buoyant uplift." Thus, 3M has not met its burden of demonstrating that there are no genuine issues of material fact as to claim scope, and the Court accordingly denies 3M's motion.[10]

9. 3M also claimed that because Freeman did not disagree with the examiner's narrow definition of "buoyant uplift", he cannot disavow it now because his "acquiescence" bars him from adopting a new definition. Because the Court has not found as a matter of law that the examiner adopted such a definition, it follows that all estoppel and reliance arguments are not relevant at this stage of the case.

10. The parties also raised issues concerning the application of prosecution history estoppel and the doctrine of equivalents. Prosecution history estoppel is used in infringement suits to limit application of the doctrine of equivalents when there is no literal infringement. *Loctite Corp.*, 781 F.2d at 870–71. Because this is not a motion for summary judgment of noninfringement, these issues are not before the Court.

894

An Order will issue in accordance with this Opinion.